THOMPSON, Judge,
concurring specially.
The policy and practices implemented by the Department of Human Resources *457 (“DHR”) in handling this case and other similar cases raises great concerns. According to the record, DHR’s training policies instruct DHR social workers to give a parent whose parenting ability' has been called into question by a complaint or investigation the alternative of avoiding DHR supervision altogether by allowing that parent to transfer, or purport to transfer, custody of his or her child to another relative; once the parent agrees to such a transfer, unless or until another complaint is lodged, DHR does not involve itself further in monitoring the welfare of the child or children involved. As the juvenile court noted, that practice seems to be “a hole in the whole system.” The concern, obviously, is for the welfare of the children who might, and eventually will, fall through that hole in the system.
DHR received two complaints within two months regarding the mother’s and her husband’s possible drug use. During the first investigation, the mother denied using illegal drugs, and DHR did not require her to take a drug-screen test. At the time the DHR social worker investigated the second complaint, the child at issue in this appeal was in the hospital being treated for pneumonia; the child’s aunts, rather than her mother, had taken the child and the child’s half sister (hereinafter together referred to as “the children”) for medical treatment at that time. At the hospital, both the mother and her husband admitted that they had recently used methamphetamine. However, rather than take the children into protective custody or open a protective-case file in order to monitor the children, the DHR social worker negotiated with the mother, an admitted drug user, regarding the transfer of custody of the children' to one of the mother’s relatives. The DHR social worker testified as follows:
“So at that point in time, I told them, I said, “Well, you have a choice.’ I said, ‘Since you have admitted to me that you have used [methamphetamine],’ I said, ‘we can — you can let the children stay with a relative, keep custody, DHR open a case, or if you do not want to work with DHR, then you can sign custody over to someone, and DHR will not open a ease.’ And so at that time, [the mother and her husband] — of course, they talked about it for a while, and then they decided they would sign custody over to [the maternal grandmother, E.G.], and I was kind of out of it from there. Then ■ [the father] came forward, and custody [of the child] was signed from [the mother] over to [the father], him being the father, and then [the half sister], I think, went with [E.G.].”
The DHR social worker indicated that had the mother not agreed to transfer custody of the children to their maternal grandmother, E.G., DHR would have removed the children from the mother’s home; the record does not indicate why the mother and DHR did not initially arrange for the child to be placed with her father. However, the DHR social worker testified that after the mother agreed to transfer. custody of the children to the maternal grandmother, DHR was no longer considered to be involved in the matter.
“[FATHER’S ATTORNEY]: Did you have any reason to continue an open case file on those children?
“[DHR SOCIAL WORKER]: No. We did not open a case due to the fact that there was an agreement to sign custody over.
“[FATHER’S ATTORNEY]: Did you not open a case also because [the mother and her husband] had indicated that they did not want to work with [DHR]?
“[DHR SOCIAL WORKER]: Right. When they were relieved of custody, then, you know, we did not open a case. *458 We would have placed the children no matter what. The children were going to leave the home that day regardless, and so, of course, we give everybody an option.... ”
By stating that the children “were going to leave the home that day regardless” of whether the mother agreed to transfer custody to a relative, the DHR social worker clearly indicated that he believed that the children’s situation warranted the filing of a petition alleging that the children were dependent. See § 12-15-52, Ala.Code 1975. Thus, although DHR clearly considered the situation serious enough to warrant the removal of the children from the mother’s custody, it did not monitor that situation, even by simply opening a case file, to ensure the safety of the children. The DHR social worker testified that he did not open a case file because the mother agreed to transfer custody of the children to E.G.; the record does not clearly indicate that DHR even verified that the custody of the children was transferred to E.G. or that the children actually went to live with and were cared for by either E.G. or the father. It is clear that DHR did not ensure that E.G. would not immediately return the child’s half sister to the mother or that the children would be safe if they were returned to the mother by their custodians. In fact, E.G. did return the half sister to live with the mother soon after the purported transfer of custody, and the DHR social worker had no knowledge of that fact until the hearing in this matter.
The record indicates that had DHR opened a case file or taken the children into protective custody, the children still would have been placed with E.G. or the father.[5] However, under those circumstances, DÍjR or a court (if the child or children were determined to be dependent) would have been in a position to monitor the family and the children to ensure that the return of the children to the mother was safe and appropriate.
The juvenile court expressed its concerns regarding DHR’s policy in the following exchange:
“THE COURT: Are you saying basically the training that you all receive now is to kind of almost immediately put folks in the position of having to choose whether DHR petitions the Court for custody, and then you make a placement as you deem appropriate, or that they kind of pick somebody that maybe has your endorsement and go get a private attorney and do it that method, and you technically stay out of it?
“[DHR SOCIAL WORKER]: Yeah. What they are — the way the policy is now is that they — like if we go and we find something to be true, somebody admits to using drugs, then what we do at that time is, you know, we tell them, ‘Okay. This is what is going to take place. These are your options.’ If we have to take custody, then we let the parents decide. You know, if they have a suitable relative, we let the parents *459 make the decision for their children of where the child will go.
“THE COURT: Was it ever discussed that maybe that defeats the spirit at least of the RC[6] decisions?
“[DHR SOCIAL WORKER]: Well, if they decide not to do that, then — you know, let’s say that we take custody, we petition and we get custody. Then we will work doing [individualized service plans] with them while the child is living with the other relative. Now, if they decide they do not want to work with DHR at all, then they can sign custody over.
“THE COURT: I am saying that is my point, though. If these folks went the other direction, said, ‘No, we are not going to voluntarily relinquish our custody. You go see the judge and see what happens,’ then you would have had to basically furnish them services, maybe—
“[DHR SOCIAL WORKER]: Right.
“THE COURT: — drug testing? So I am just saying is it ever talked about in these training sessions we are kind of making an end run around here, the spirit of RC, the—
“[DHR SOCIAL WORKER]: That is my opinion on it, too. One part of RC says that they want the parents to make a decision, you know, based on whether they want to work and then — or what, you know, and then they turn around and say, Well, you know, we work with families. We provide these services.’ Had it been that [the mother] would have said no, you know, the children would have — we would have still petitioned to have the children removed or an agreement with them [sic], then they would have worked with DHR, done an ISP, opened a case, assigned an ongoing worker and had to go through the counseling and programs and everything like that from that aspect. And then, of course, it would have come back—
“THE COURT: Let me just — I do not think this is really hypothetical. [The mother and her husband] have turned in a drug test ... dated [February 5, 2004], which would be six weeks after the children were removed, that seems to indicate that the [mother and her husband] passed and apparently [E.G.], at least partially, returned [the child’s half sister] to [the mother and her husband]. So is that something that soon — they had been through no rehab, no treatment, no classes, no nothing, and—
“[DHR SOCIAL WORKER]: See, that is something I was not aware of.
“THE COURT: I am just saying that seems like just a hole in the whole system, so to speak.”
The legislature has set forth a number of duties and responsibilities of DHR. Among those responsibilities is the requirement that DHR:
“(10) Seek out, through investigation, complaints from citizens, or otherwise, the minor children in the state who are in need of its care and protection and shall, as far as may be possible, through existing agencies, public or private, or through such other resources, aid such children to a fair opportunity in life.”
§ 38-2-6(10), Ala.Code 1975. I believe that it is easily foreseeable that a parent faced with the option provided by DHR’s policy could conspire with family members to fake a custody transfer to avoid DHR involvement, or that a child could be returned to an unsuitable parent by a relative who is unwilling or unable to continue to care for the child.
*460 It is clear that current State-wide financial constraints have left DHR, like other State agencies, underfunded. According to the DHR social worker, the DHR policy of providing parents the option of avoiding DHR monitoring of their possibly dependent children seems to be based, at least in part, on a desire to reduce DHR’s caseload.[7] However, the very purpose of DHR — to protect dependent children — is defeated if its policies and practices provide parents of dependent children a method by which they can (and will) attempt to bypass the monitoring and supervision intended to protect their children.

. With regard to the placement of the children had the mother agreed to work with DHR, the DHR social worker testified as follows:
"[MOTHER'S ATTORNEY]: And you say that you gave [the mother] a choice there that she could either give up custody or work with DHR?
"[DHR SOCIAL WORKER]: Yes.
"[MOTHER’S ATTORNEY]: If [the mother] had worked with DHR, where would you have placed the children?
[[Image here]]
"[DHR SOCIAL WORKER]: If [the mother] had worked with DHR, an ongoing worker would have been assigned, and it would have been' — well, the same thing as what we did....”
(Emphasis added.)

6. R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997).

. The DHR social worker explained DHR’s policy as follows:
"Q: Is this a policy that DHR is following now that if a person — when you find these situations that if these persons will go and get a private attorney, then [DHR does not] open a file? Is that—
"[DHR SOCIAL WORKER]: According to DHR policy — of course, it has been revised, and according to the policy now, you know, whoever is the custodial parent, if custody is not with the parent — in other words, if the children are not in the home and custody is relieved, then according to our code, we—
"Q: You are not in it?
"[DHR SOCIAL WORKER]: Right. We do not open a case.
"Q: Okay. It also cuts down on the caseload, too?
"[DHR SOCIAL WORKER]: I think that is the reason for it, to be honest with you.”